## Case No. 16,111.

### UNITED STATES v. QUITMAN.

[2 Am. Law Reg. 645.]

Circuit Court, E. D. Louisiana. July, 1854.

NEUTRALITY LAWS—POWER OF FEDERAL COURTS—BONDS TO OBSERVE LAWS—GRAND JURY.

1. A judge of the United States has power, on just grounds of suspicion, to require bond to observe the neutrality laws.

2. A grand jury charged with inquiring as to the existence of an organization whose object was the invasion of the territory of a friendly power, presented that the principal witnesses examined before them, and who were rumored to be the leaders in the unlawful enterprise, had refused to answer questions propounded to them on the subject, on the ground that it would criminate themselves. The grand jury also presented that, though they were unable to elicit any facts on which to base an indictment, or to show the existence of any actual military organization, yet that they believed that some such organization was in contemplation. *Held*, that there were sufficient grounds for requiring from the parties who declined to testify before the grand jury, bonds to observe the neutrality laws of the United States.

CAMPBELL, Circuit Justice. This case originated in a requisition by the court upon the defendant [John A. Quitman] to show cause why he should not give a bond to observe the laws of the United States in reference to the preservation of their neutral and friendly relations with foreign powers, contained in 3 Stat. 447.

The occasion for this requisition was made by a report of the grand jury, of which the following is an extract: "Report of the Grand Jury.—The grand jury beg leave to report to your honor that, in the discharge of the duty confided to them by the court, they have cited from among their fellow citizens a number of persons as witnesses to testify, and to prove from them, if possible, evidence in relation to the rumor in this city of an expedition, said to be on foot, the tendency and purpose of which would be to violate the neutrality laws of the United States. Among the witnesses cited were several whose names figured most prominently with the rumored expedition; and from the refusal of some of them to testify (as is known to the court) on the ground they could not do so without criminating themselves under the ruling of the court, the obvious inference left upon the minds of the grand jury was, that those rumors were not altogether without foundation; and from collateral evidence brought to their notice in the course of the investigation, they are further left to infer that meetings have been frequently held upon the subject of Cuban affairs, and that what are termed 'Cuban Bonds' have been issued, that funds have been collected, either by contributions, sale of these bonds, or promises to pay, to a very considerable amount, which was, or would be hereafter, at the disposal of whomsoever might be chosen to the command of an expedition purporting to be in aid of the Cuban revolutionists; but from a strict and searching investigation of the witnesses through the district attorney, the grand jury have been unable to elicit any facts upon which to found an indictment against any one. Although the grand jury strongly incline to the opinion that these meetings and collections of funds have for their end the organization of an expedition either for the purpose of assisting in a Cuban revolution, or of making a demonstration upon that island, yet the plan, whatever it may be, seems altogether in the prospective, and, aware as we are, that a great deal has been said and written about the extensive and formidable preparations on foot for the purpose of revolutionizing Cuba, we believe it has been very much overrated and magnified—nothing like a military organization or preparation having been brought to our notice."

At the time the report was made, the name of the defendant was returned with others who had declined to answer the interrogatories of the jury, and a printed statement of the facts which had occurred while he was before the jury has been filed. By that statement it appears that a printed circular, marked "private and confidential," signed by J. S. Thrasher as "corresponding secretary" of an association, was handed to the witness, was examined by him, and he was asked for an account of the meetings and proceedings described in it. That the witness declined to give information because his answers would criminate him. The printed circular referred to is also filed. It discloses the facts of several meetings in New Orleans, for the purpose of considering upon the means of liberating Cuba from the government of Spain; that there is a junto which acts in the name of "Free Cuba" and represents its "aspirations;" that this junto has collected a large sum of money ($500,000), and holds intercourse with military men in the United States, relative to that object; that it issues bonds in the name and upon the pledge of the independent island and proposed government, and makes contracts with citizens of the United States to be trustees and treasurers of the movement, and to take the military control of it. It contains the contract of a board of American trustees to hold its money, and the declarations of an eminent military leader, who agrees to take the command of the expedition when a million of dollars are collected. That the meetings are all in the design of fulfilling this requisition of this leader, whose name is not given. The bonds are issued to the subscribers at one-third their par value, and the military leader is pledged, should the expedition prove successful, to employ his influence to procure their assumption as a public debt of "Free Cuba." The circular discloses the fact that Cuba is in no condition to effect her own liberation; that the strength of the government and the vigilance of its police exposes every revolutionary movement in the island to defeat. The whole plan is addressed to citizens of the United States, and is for their execution. The military chief, selected from the United States, is the soul of the enterprise. The defendant is known to be an accomplished soldier, having a large share of the public confidence, and especially of those states which border on the Gulf of Mexico. The report of the grand jury is, "that his

name has figured prominently with the rumored expedition," and for that reason he was cited to afford evidence "in relation to the rumor in this city of an expedition, the tendency and purpose of which would be to violate the neutrality laws of the United States." The circular I have described was handed to the defendant, and was inspected by him, and it contains a description of a person and the report of a speech, which, perhaps, might be attributed to the defendant without great injustice, whenever the fact is ascertained that he would consent to implicate himself in an enterprise like that set forth. The defendant confessed the fact of a connection of a kind which rendered it a matter of impropriety for the grand jury to press any question upon him relative to the details of the movement. "The obvious inference," say the grand jury, "is that these rumors were not altogether without foundation," and they find from other evidence, that an expedition is on foot, "for the purpose of assisting a Cuban revolution, or of making a demonstration upon the island."

The questions presented to the court are, is there a reasonable ground for the belief that the defendant is connected with the preparation of such an enterprise? Does the existence of such a suspicion impose a duty upon the court? The defendant contends that I have no right to rest any proceeding upon the inference of the grand jury, or to deduce any conclusion unfavorable to him from this conduct. The constitution of the United States does not allow the examination of a witness in any criminal case against himself, except with his consent. The common law of evidence extends the exemption, and he is not required to answer in any case either as a witness or a party, the effect of which answer might be to implicate him in a crime or misdemeanor, or subject him to a forfeiture. Burr's Case [Case No. 14,692e]; Cloyes v. Thayer, 3 Hill, 564. This privilege belongs exclusively to the witness. The party to the suit cannot claim its exercise, nor object to its waiver by the witness. 2 Russ. Crimes, 929; People v. Abbot, 19 Wend. 195. The witness asserts this privilege on oath. The assertion is direct and positive that his answer will implicate him in a prosecution or forfeiture, and the court accepts his declaration without an inquiry as to what his answer will be. The inquiry of the court is, may the answer be such that it can be used as evidence against him? If the witness claims the privilege falsely and corruptly, he is guilty of perjury, and if by his falsehood he deprives a party of the benefit of necessary testimony, he is answerable for the damage he occasions in a civil action. Poole v. Perritt, 1 Spears, 128; Warnen v. Lucas, 10 Ohio, 336. The profound author of the "Treatise on Judicial Evidence" inquires whether, if all the criminals of every class had assembled and framed a system after their own wishes, is not this rule the very first which

they would have established? Innocence can have no advantage from it; innocence claims the right of speaking, must speak, while guilt alone invokes the security from silence. The supreme court of Ohio say, in the case last cited, "For a witness to refuse to testify, because his testimony may criminate him, is at once to pronounce his own turpitude. Not one man in a thousand would, without reason, venture upon so perilous a situation." It was for a time supposed that questions addressed to a witness tending to criminate him, could not be propounded. This notion has been discarded, and the witness is driven to plead his exemption. When this plea is made in the case of third persons, no inference can be drawn unfavorable to the parties to the record. The plea is not theirs, and their suit should not be affected by the act of a stranger. 2 Starkie, N. P. 157, 158; 1 Russ. & M. 382, note. Though this doctrine is impugned by high authority. 2 Russ. 939; 1 Russ. & M. 382, note.

The case before me is not this case. The grand jury representing the United States, were taking an inquisition of the crimes against their authority, and were entitled to the information which their fellow citizens had. They have ascertained the existence of acts in violation of law. The defendant excuses himself from affording information he possesses, because his relations to those acts are such that his answers would criminate him. He has conducted himself so that an ordinary, but a most important duty cannot be fulfilled. It is my duty to afford to defendant every exemption that the laws have conferred. The constitutional exemption originated in the righteous abhorrence of our ancestors for the proceeding of those tribunals of the continent of Europe, where the rack and torture wrung from the accused, in the agony of their pain, words admitting guilt. I do not compel the defendant to answer.

It is said, that drawing a conclusion unfavorable to the defendant's innocence, from his refusal to answer, is equivalent to compelling a confession. The objection is specious, but without any application to the case in which it is preferred. The requisition upon the defendant involves no criminal prosecution nor charge of guilt, nor is the requisition a punishment. In the times of the Saxon constitution, every subject of England was held to give securities for his good behavior, who were to produce him to every legal charge; and if he did wrong, and escape, to bear what he ought to have borne. 1 Spence's Inquiry, 352, 3. Blackstone describes this as a preventive justice, "applicable to those as to whom there is a probable ground to suspect of future misbehavior." That the precaution spoken of is intended merely for prevention, without any crime actually committed by the party, but arising only from a probable suspicion that some crime is intended, or likely to happen, and

consequently is not meant as any degree of punishment. 4 Bl. Comm. 252: 1 Term R. 696, 700. The statute of Edward III. defined the powers of magistrates in the exercise of this jurisdiction. That statute invested justices with authority to take and arrest all those that they may find by indictment or by suspicion, and put them in prison, and "to take of all that be not of good fame, where they shall be found, sufficient surety and main prize of their good behavior;" "to the intent that the people be not by such rioters troubled, nor endangered, nor the peace blemished." The interpretations of this statute comprehend all whom the magistrate shall have just cause to suspect to be dangerous, quarrelsome, or scandalous. Hawk. P. C. bk. 2, c. 8, § 16. Dalton enumerated twenty classes of offenders who fall within it, including rioters, common quarrellers, such as lie in wait to rob, steal. make assaults, put passengers in fear. libellers, persons guilty of mischief to animals, and concludes whatsoever act or thing is of itself a misdemeanor, is cause sufficient to bind such an offender to the good behavior. Dalt. Just. 124. The cases in which this jurisdiction has been exercised are numerous. A person who said "he would do everything in his power to annoy another, short of actual violence," was held to give surety, the court declaring "we should be poor guardians of the public peace, if we could not interfere until an actual outrage had taken place, and perhaps fatal consequences ensued." "If a party inform the court or a justice of the peace, that he goes in fear and in danger of personal violence, by reason of threats employed against him, and pray protection of the court, the court, will grant it." 12 Adol. & E. 599. Nor will the defendant be allowed to controvert the facts or bring counter evidence. 13 East, 171. The whole rests on the principle that this is not a criminal proceeding. nor designed as a punishment. 1 Durn. & E. [1 Term R.] 700. I have thus traced the nature and extent of this jurisdiction in England, for the reason that it is the model upon which the same jurisdiction in Louisiana has been framed. Crimes, offences and misdemeanors mentioned in her statutes, and the modes of proceeding and rules of evidence, are construed, intended and taken with reference to the common law of England. except as otherwise provided. Rev. St. 213. Justices are allowed to take securities of the peace, when there is a just cause to apprehend that a breach of the peace is intended. Rev. St. 220, § 48. The laws regulating the internal police of the state, under the title "vagrants, vagabonds, and suspected persons" (Rev. St. 587 et seq.), confer a jurisdiction similar to that described by Hawkins and Dalton, under the statute of Edward III. Persons found under circumstances of suspicion, and whose conduct awakens apprehension for the security of property or of life, or for the maintenance of order and decorum, persons whose conduct jeopards the tranquility of society, or the supremacy of laws, are subject to arrest, under these statutes, and may be held to security or sent to the house of correction. I find no words in any English statute or commission more broad and comprehensive. It is true that these statutes affect the loitering, idle, vagrant and pauper population, and seem to have been framed for that class. But the law is not a respecter of persons, and if the proud and powerful place themselves, by crime, in the ranks of the suspicious. or vagrant, the law does not regard their pride or power. The supreme court of Louisiana, at an early. period, exercised the power in question in.a case of libel, and rested upon common law authorities. Nugent's Case, 1 Mart. (La.) 103. The authority of this court is derived from the act of congress of 1793 (1 Stat. 609, c. 82). The judges of the supreme court by that act "have power and authority to security of the peace, and for good behaviour in cases arising under the constitution and laws of the United States, as may or can be lawfully exercised by any judge or justice of the peace of the respective states in cases cognizable before them." Crimes against the United States are ascertained from their statutes. Those laws. like the laws of the states, are designed to secure the public peace and to promote domestic tranquillity. The powers granted to the justices of the supreme court extend only within the limits of that department of the public order which has been committed to the oversight of the federal government. The assembly of a body of men for the purpose of disturbing the peace of a city, or to invade private property, or to assail a particular person, would be an unlawful assembly or court, or if followed by an unlawful act, a riot under state laws. And first in the list of the offences described by Dalton and Burns, which fall within the remedial statutes we have considered. are those. By the treaties with Spain and by the neutrality laws. the United States have placed the territories of that kingdom under their protection against military and naval expeditions or enterprises from their borders or conducted by their citizens. They are in our peace; the attempt of a citizen to disturb that peace, by beginning, or setting on foot, or providing means for a military or naval expedition, is a breach of that peace. The statute pronounces those acts to be misdemeanors. The most restricted construction of statutes which authorize the requirement of securities for good behaviour must comprehend the cases arising under this statute.

The question now arises, under what circumstances can this requisition be made? The authorities say, "that the justices have power to grant it either by their own discretion or upon the complaint of others; yet that they should not command it. but only upon sufficient cause seen to themselves or upon the complaint of other very honest or

credible persons." Hawkins and Blackstone define the discretion to be a legal discretion, to be put in exercise upon a just cause of suspicion. The facts disclosed in the report of the grand jury, with the explanatory evidence accompanying that report, leave me no room for hesitation or doubt. I have set forth at large the reasons for the judgment I have given, that there may be no misconstruction nor mistake of the grounds upon which this court acted. I have explained, in the charge addressed to the grand jury, my sense of the importance of the act of congress involved in this discussion, and my opinion of the. policy in which it is founded. The honor of our country, the fair repute of its citizens, in my opinion, require an exact observance of that act. It is a law binding upon our whole people, and the principles, which justify its violation, menace the order and repose of the whole confederacy. But if my opinions were the reverse of what they are, in the position I occupy, I have but a single duty to perform. To the full extent, and no further, of the powers conferred upon me, I must enforce its execution. The defendant has, before a portion of this court, declared his inability to fulfill the public duty of affording information of practices involving a breach of the laws. That this inability arises from some undisclosed connection with those who are thus engaged. The president of the United States has admonished the country that there is danger of a violation of these important statutes, and the grand jury, after a patient investigation, certify that this admonition has a legitimate foundation. Public rumor has attached suspicion to the name of the defendant, according to the certificate. I will say with the chief justice of England, already quoted, "We should be poor guardians of the public peace, if we could not interfere until an actual outrage had taken place, and, perhaps, fatal consequences ensued."